**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

**Amy Mash**

v.

Case No. 1:25-cv-518-PB-TSM
Opinion No. 2026 DNH 118

**Frank J. Bisignano, Commissioner,**
**U.S. Social Security Administration**

**MEMORANDUM AND ORDER**

Amy Mash challenges the partial denial of her application for disability insurance benefits pursuant to 42 U.S.C. § 405(g). Mash principally claims that the administrative law judge ("ALJ") improperly discounted evidence of her asserted mental impairments in concluding that she was not disabled over a sixteen-month period in 2020 and 2021. She moves for an order reversing the ALJ's decision, while the Commissioner moves for an order affirming it. For the reasons stated below, I conclude that the ALJ's findings are supported by substantial evidence.

# I. BACKGROUND[1]

## A. Procedural Facts

Mash applied for social security benefits on July 20, 2023, seeking disability insurance benefits and supplemental security income. Doc. 4 at 311-24. She initially alleged a disability onset date of December 31, 2017, at which time she was thirty-seven years old. Id. at 313. She holds a high school diploma and was previously employed as a "remote customer service and communications agent," though she has not worked since 2017. Id. at 331, 438. Her date last insured was December 31, 2019. Id. at 375.

Mash's application was initially denied on February 28, 2024, id. at 165-175, and upon reconsideration on September 27, 2024, id. at 227-34. Represented by counsel, Mash requested a hearing before an ALJ. Id. at 243. Mash's counsel also amended Mash's asserted disability onset date to December 31, 2019, the same as her date last insured. See id. at 440. An online video hearing was held on March 11, 2025, at which Mash and a vocational expert testified. Id. at 92-121.

---

1 Mash submitted a statement of material facts as required by Local Rule 9.1(b) with which the Commissioner "generally agrees." See Doc. 5-2; Doc. 6 at 2. I draw on that statement and the entire administrative record to construct a brief factual history of Mash's case. See Doc. 4.

The ALJ issued a mixed decision on March 27, 2025. Id. at 67-86. The ALJ determined that while Mash has indeed suffered from several severe physical impairments since her amended disability onset date, her medically determinable mental impairments only impose mild limitations on her mental functioning. Id. at 73-76. Moreover, the ALJ determined that Mash's physical impairments only worsened to the point of rendering her disabled as of May 3, 2021. Id. at 77-81. Thus, the ALJ concluded that Mash was not disabled over the sixteen months between December 31, 2019, and May 3, 2021, but was disabled thereafter. Id. at 83.

The Appeals Council affirmed the ALJ's decision in full on October 15, 2025, rendering it the final decision of the Commissioner. Id. at 6-8. On December 11, 2025, Mash filed the present action seeking its reversal. Doc. 1.

**B. Mental Impairments Evidence**

Mash's arguments on appeal of the Commissioner's decision are largely trained on the ALJ's engagement with her evidence of mental impairments. Specifically, Mash disagrees with the ALJ's findings that the opinions of her treating psychiatrist, Dr. Andrew Morris; her consultative psychologist, Dr. Robert Prescott; and her social worker, Lillian Grover, were "less than fully persuasive" or "unpersuasive." See Doc. 4 at 75. Because their opinions form the basis of Mash's appeal, I review them in turn.

1. Dr. Andrew Morris, M.D.

In assessing Mash's mental functioning, the ALJ considered numerous records generated by her treating psychiatrist, Dr. Morris, as well as a nurse practitioner from the same clinic, Jonathan Hickman. Id. at 73-76. Most of these records are treatment notes from Mash's eight visits to Dr. Morris's clinic from 2019 through 2022, which the ALJ credited and heavily relied upon. See id. The one outlier among the records created by Dr. Morris is a letter that he drafted after evaluating Mash on January 29, 2025, which the ALJ rejected. See id. at 75.

Beginning with their treatment notes, Dr. Morris and Hickman acknowledge throughout the cited three-year period several psychiatric diagnoses afflicting Mash, including PTSD, generalized anxiety disorder, and excoriation disorder. See id. at 451, 500-02, 510-11, 514-15, 531, 1438-42, 1445-46. Yet, notwithstanding those diagnoses, both clinicians also consistently characterize Mash's psychiatric condition at the same visits as stable and improving with medication. See id. For example, back in January 2019, Hickman wrote, "[Mash] is surely doing well at this time, but she is having some anxiety due to a variety of factors." Id. at 451. Sometime after

that, Mash was prescribed sertraline, a common antidepressant.[2] Compare id. at 452 (no sertraline prescription in January 2019) with id. at 536 (sertraline prescription listed in February 2020). From then on, both clinicians note at subsequent visits the medication's stabilizing effect on Mash's mental health conditions. See, e.g., id. at 510 ("She reports tolerating [sertraline] without any side effects. . . . She feels that her mood is pretty stable at this time."); id. at 501 ("The patient's psychiatric status appears fairly stable, at her baseline, with anxiety symptoms and insomnia under reasonably good control. She has not been feeling particularly depressed."); id. at 1445 ("She said she has not been feeling depressed nor overly anxious . . . . She said she is functioning adequately. She does not perceive the need for any change in medication to treat anxiety or depression."); id. at 1442 ("The patient's overall psychiatric status, despite significant chronic medical problems, appears reasonably stable at the present time . . . ."). In fact, after receiving the sertraline prescription, Mash only appears to have reported an adverse psychiatric symptom once, at which time Hickman responded by increasing her dosage. See id. at 514-15 ("In regards to her

[2] Sertraline, a selective serotonin reuptake inhibitor ("SSRI") commonly known as Zoloft, is an oral antidepressant. Zoloft, PDR.NET, https://www.pdr.net/drug-summary/?drugLabelId=474 (last visited Sept. 1, 2026) [https://perma.cc/C4ZH-EKRH].

anxiety, she has had some ruminating thoughts that she has been able to try to work through. . . . She would probably benefit from increasing the sertraline up further. We will see if this can target her anxiety.").

Corroborating these observations, Mash's mental status examination at every post-prescription visit with Dr. Morris or Hickman shows generally normal findings. See id. at 501, 511, 515, 531, 1434, 1438, 1442. In January 2022, her most recent visit with cited treatment notes, her positive psychiatric trajectory appeared to continue unabated. See id. at 1439 ("She will, for now, continue on the current psychiatric medication regimen.").

Against this backdrop, Dr. Morris's January 2025 letter is an outlier. See id. at 2297. There, he states that Mash "has significant chronic symptoms psychiatrically which are the cause of permanent disability." Id. He goes on to explain his view that "[h]er disability is especially evident" when her psychiatric symptoms are viewed in light of her "significant physical-health-related symptoms," which he lays out in moderate detail and contends "have all started or become markedly worse SINCE" her prior consultative examination by Dr. Prescott, discussed below. Id. In addition to proposing a nexus between Mash's physical and mental impairments, Dr. Morris concludes in his letter that he "find[s] her psychiatric symptoms are in and of themselves disabling." Id. Finally, he notes that he "firmly endorse[s] the findings and conclusions" of Dr. Prescott. Id.

As noted, the ALJ generously credited Dr. Morris and Hickman's contemporaneous notes on Mash's condition, summarizing those records as "generally show[ing] that [Mash] improved with medication and treatment, providers indicated that she was functioning well and stable, and she presented normally in mental status examinations." Id. at 74. By contrast, the ALJ found Dr. Morris's January 2025 letter "unpersuasive" because it "is not consistent with or supported by the medical evidence of record." Id. at 75. In the ALJ's view, Dr. Morris's recent opinion letter was not "consistent with or supported by" his own and Hickman's series of treatment notes. Id. The ALJ additionally took umbrage with Dr. Morris's assertions of Mash's disability status as a matter of law, noting that these statements "deal[] with an issue reserved to the commissioner." Id.

2. Dr. Robert Prescott, Ph.D.

The consultative examination by Dr. Prescott to which Dr. Morris alludes in his letter occurred more than six years earlier. Id. at 441. In November 2018, Dr. Prescott prepared a seven-page psychological profile of Mash based on his observations during a visit with her, her historical recollection of symptoms and related events, and her documented medical history through August 2018. Id. at 441-47. According to the first several pages of his profile, Mash told Dr. Prescott about extensive struggles with anxiety and depression symptoms dating back to high school, some of which

were caused or exacerbated by various traumatic experiences throughout her life. Id. at 441-45. In addition, while Dr. Prescott observed Mash to be "quite anxious and fidgety" and "tearful much of the time" at their appointment, he also noted in his profile that she was "logical and coherent" and that her affect was "generally appropriate to content." Id. at 445.

Dr. Prescott also conducted several tests of Mash's "sensorium functions" at their visit. Id. Mash passed all but two of these tests: she could not recall the exact date, though she could recall the month, year, and day of the week; and she could not fully perform "digit repetition" (repeating back a sequence of digits in a row). Id. Based on these results, Dr. Prescott wrote in his profile that Mash's "intellectual functioning is estimated to be at least within the average range." Id.

In the last section of his profile, Dr. Prescott opined on Mash's functional capacity under each of the four areas of mental functioning set out the social security regulations. See id. at 446-47; 20 C.F.R. Part 404, Subpart P, Appendix 1. As to Mash's capacity for the first area ("understanding, remembering, and applying information"), Dr. Prescott wrote that Mash "appears generally able to understand and remember basic work-like instructions" and "able to make adequate judgments on fairly straightforward though not complicated work-related decisions." Doc. 4 at 446. As to the second ("interaction with others"), Dr. Prescott said that Mash "appears

generally able to communicate politely" but, because of her anxiety, "does not appear able to be around others in a typical work setting without considerable distress." Id. For the third area ("concentration, persistence, and maintaining pace"), Dr. Prescott reported that Mash was "able to focus attention on basic work activities for short periods though not extended ones" and "able to complete some straightforward work-like tasks" at "a considerably reduced pace." Id. at 446-47. Finally, Dr. Prescott described Mash's capacity for the fourth area ("adaptation and managing oneself") as "able to control behavior on the job" such that she would not "act out" but was unable to "effectively regulate emotions or maintain well-being in a typical work setting on a consistent, sustained basis." Id. at 447. At bottom, Dr. Prescott diagnosed Mash with post-traumatic stress disorder ("PTSD") and an unspecified depressive disorder. Id.

Reviewing Dr. Prescott's profile and opinions therein nearly seven years later, the ALJ concluded that they were "less than fully persuasive." Id. at 75. The ALJ noted that Dr. Prescott's evaluation occurred about a year before Mash's amended disability onset date and is inconsistent with the bulk of her more recent treatment notes by Dr. Morris and Hickman, which show "improved symptoms with medication and treatment" and "largely normal findings." Id. As a result, the ALJ concluded that the "evidence does not support Dr. Prescott's[] assessment during the relevant period." Id.

3. Lillian Grover, LICSW

Mash also supplied the ALJ with a form "mental residual functional capacity assessment" prepared by her social worker, Lillian Grover, on May 8, 2024. Id. at 1914-17. According to the assessment, Mash saw Grover on a biweekly basis from March 2016 through May 2024. Id. at 1914.

The form assessment asks the evaluator to describe a patient's capacity to engage in each of several activities (categorized by the four mental functioning areas above) by selecting one of five words: "None," "Mild," "Moderate," "Marked," and "Extreme." Id. at 1915. Relevant here, the assessment defines "marked" to indicate that the patient's "ability to function in this area is seriously limited" and "extreme" to mean that the patient's "ability to function in this area is precluded." Id.

In completing the form, Grover did not indicate any marked or extreme limitations on Mash's capacity for social interaction and adaptation (the third and fourth functional areas above). Id. at 1916-17. She did, however, indicate that Mash had a "marked" limitation in her "ability to remember locations and work-like procedures" under the "understanding and memory" functional area, and she indicated that Mash had marked or extreme limitations on several activities related to the "sustained concentration and persistence" functional area. Id. at 1915-16. Additionally, in response to summary queries at the bottom of the form, Grover answered that Mash's impairments would

"substantially interfere with [her] ability to work on a regular and sustained basis at least 20% of the time" and would require Mash to miss twenty days of work per month. Id. at 1917. Grover noted that Mash had been functioning at the level indicated on the form "since 2019." Id.

The ALJ found this opinion "unpersuasive." Id. at 75. Stating that Grover's "assessment is consistent with or supported by the medical evidence of record,"[3] the ALJ contrasted her answers with Dr. Morris's and Hickman's treatment notes establishing "that [Mash] improved with medication and treatment" and that she "usually presented normally in mental status examinations." Id. The ALJ accordingly did not rely on Grover's contrary assessment. See id.

### C. The Five-Step Sequential Analysis and ALJ Decision

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the Commissioner must follow a five-step sequential analysis. 20

[3] A careful reader may notice that this line appears misquoted, as it states the opposite of the ALJ's conclusion. Read on, as this textual discrepancy forms the basis for one of Mash's principal arguments on appeal.

C.F.R. § 404.1520. If the claimant has met his burden at steps one through four, the burden then shifts to the Commissioner at step five. Id. § 404.1560(c)(2).

At step one, the ALJ considers whether the claimant's present "work activity" constitutes "substantial gainful activity." Id. § 404.1520(a)(4)(i). If so, the claimant is "not disabled regardless of [her] medical condition or [her] age, education, and work experience." Id. § 404.1520(b). Here, the ALJ determined that Mash had not engaged in substantial gainful activity since December 31, 2019, her amended disability onset date. Doc. 4 at 73.

At step two, the ALJ considers whether the claimant has "a severe medically determinable physical or mental impairment" or "combination of impairments" that have lasted or are expected to last for at least a year which "significantly limits [her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(a)(4)(ii), (c). If the claimant lacks an impairment of such severity, he is not disabled. Id. § 404.1520(a)(4)(ii). If the claimant has at least one, however, he proceeds to step three. See id. Here, the ALJ concluded that Mash suffers from nine physical impairments of qualifying severity: postural orthostatic tachycardia syndrome, small fiber neuropathy, Ehlers-Danlos syndrome, chronic regional pain syndrome, degenerative disc disease, right shoulder impairment, headache disorder, obesity, and right hip degenerative joint disease. Doc. 4 at 73. As noted,

however, the ALJ determined that Mash's asserted mental impairments only impose a "mild limitation" on her mental functioning. Id. at 74. In reaching that determination, the ALJ credited the treatment notes authored by Dr. Morris and Hickman as well as the opinions of state psychological consultants who arrived at the same conclusion. Id. at 74-75.

At step three, the ALJ considers whether the claimant has an impairment that "meets or equals" an impairment listed in Appendix 1 to 20 C.F.R. Part 404, Subpart P which has lasted or is expected to last for at least a year. 20 C.F.R. § 404.1520(a)(4)(iii), (d). If the claimant suffers from such an impairment, he is disabled. Id. § 404.1520(a)(4)(iii). Here, the ALJ found that none of Mash's impairments met or equaled a listed impairment. Doc. 4 at 76.

At step four, the ALJ determines the claimant's residual functional capacity ("RFC") "based on all the relevant medical and other evidence" in the record. 20 C.F.R. § 404.1520(e). Based on that assessment, the ALJ determines whether the claimant "can still do [her] past relevant work." Id. § 404.1520(a)(4)(iv), (f). If so, the claimant is not disabled. Id. In undertaking this analysis, the ALJ considers "all the relevant medical and other evidence," id. § 404.1520(e) (emphasis added), including that of "medically determinable impairments that are not 'severe'" under step two, id. § 404.1545(a)(2). Here, as of December 31, 2019, the ALJ found Mash capable of performing

> sedentary work . . . except the claimant could stand and walk for two hours in an eight-hour workday. She could sit for six hours in an eight-hour workday. She could occasionally push and pull with the bilateral lower extremities. She could occasionally use ramps and stairs, but could never climb ladders, ropes, or scaffolds. The claimant could occasionally stoop, kneel, crouch, crawl, and balance, with occasional balancing further defined as needing to avoid all narrow, slippery, and erratic moving surfaces. She needed to avoid even moderate exposure to cold temperatures, noise, vibration, and hazards (such as dangerous moving machinery and unprotected heights).

Doc. 4 at 76-77. The ALJ reached the same conclusion regarding Mash's RFC since May 3, 2021, but with the added caveat that she "must use a walker to ambulate" and "must alternate between standing and sitting every 30 minutes, while sitting for 10 minutes at a time to relieve pain." Id. at 80.

At step five, the ALJ considers whether, given the claimant's RFC, age, education, and work experience, the claimant "can make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v). If so, the claimant is not disabled. Id. The Commissioner bears the burden of proving "that other work exists in significant numbers in the national economy that [the claimant] can do." Id. § 404.1560(c)(2). Here, the ALJ credited the testifying vocational expert's testimony that an individual with Mash's RFC, age, education, and work experience as of December 31, 2019, could perform the requirements of occupations such as "order clerk," with 26,000 jobs available in the national economy; "charge account clerk," with 38,000 jobs available; and "information

clerk," with 23,000 jobs available. Id. at 82. The ALJ accordingly concluded that the Commissioner's burden was met at step five as of December 31, 2019, and thus that Mash was not disabled under the Social Security Act as of that time. Id. at 83-84. However, the ALJ also credited the expert's testimony that, as of May 3, 2021, Mash's "additional limitations erode" the available occupational base, rendering her disabled from then on. Id.

## II. STANDARD OF REVIEW

I am authorized to review the pleadings submitted by the parties and the administrative record and enter a judgment affirming, modifying, or reversing the "final decision" of the Commissioner. 42 U.S.C. § 405(g). That review is limited, however, to "determining whether the [Commissioner] used the proper legal standards and found facts [based] upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). I defer to the Commissioner's findings of fact so long as they are supported by substantial evidence. Id. Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Irlanda Ortiz v. Sec'y of Health & Hum. Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Hum. Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

If the Commissioner's findings are supported by substantial evidence, they are conclusive, even where the record "arguably could support a

different conclusion." Id. at 770. But his findings are not conclusive "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam). "Issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Commissioner, and the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [him], not for the doctors or for the courts." Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018) (citation modified).

## III. ANALYSIS

To obtain reversal (or, more realistically, vacatur and remand) of the ALJ's decision, Mash primarily challenges its analysis on step two of the five-step analysis above. In doing so, Mash asserts that the ALJ's discrediting of Dr. Morris's letter, Dr. Prescott's psychological profile, and Grover's form assessment was "not supported by the evidence in the case." Doc. 5-1 at 4. Read generously, Mash seems to intimate that had the ALJ properly credited this evidence, he would have necessarily concluded that her mental impairments were of sufficient severity to alter his subsequent analyses of her RFC and job availability on steps four and five, respectively.[4] Mash also

---

4 Of course, even if the ALJ reached a more favorable conclusion with respect to Mash's mental impairments on step two, it does not necessarily follow that his findings would have differed on steps four and five. Indeed, in

lodges an unrelated objection to the ALJ's vocational analysis on step five, which I address separately.

## A. Mental Impairments Evidence

As is evident from their summary above, a common thread runs through the reasons provided by the ALJ for discounting the three medical opinions at issue. To explain his doubts about those opinions' credibility, the ALJ pointed to the same source of competing evidence: the eight visit summaries authored by Dr. Morris and Hickman spanning January 2019 to January 2022. See Doc. 4 at 75 (citing id. at 451, 500-02, 510-11, 514-15, 531, 1438-42, 1445-46). As to each countervailing opinion, the ALJ had the same essential explanation for rejecting it: that it was "not consistent with or supported by the medical evidence of record," namely those providers "note[s] that [Mash] improved with medication and treatment" and that "[Mash] usually presented normally in mental status examinations" at each visit. Id.

Considered in light of that throughline, it is misleading to suggest, as Mash does, that the ALJ "found the opinion of every examining and treating physical and mental health care provider unpersuasive." Doc. 5-1 at 3. Quite

---

Mash's own case, the ALJ found favorably on step two that her physical impairments were severe in 2020 and early 2021, yet he nonetheless ruled her nondisabled as to that sixteen-month period. Doc. 4 at 73, 77-80, 82-83. Regardless, Mash does not develop any argument regarding the import of her mental impairments to the ALJ's analysis on the final two steps.

the contrary, the ALJ credited the views of Mash's providers as documented in their contemporaneous treatment notes, which is what in turn compelled him to discredit the contradictory opinions that those providers and others offered in support of Mash's subsequent disability benefits claim. The ALJ acted well within its discretion in discrediting the three outlying views based on their lack of support from and inconsistency with Mash's treatment records. See 20 C.F.R. § 404.1520c(b)(2), (c)(1)-(2) (treating "supportability" and "consistency" as "the most important factors" in determining the persuasiveness of a medical opinion). After all, resolving such "[i]ssues of credibility . . . are the prime responsibility of the Commissioner." Purdy, 87 F.3d at 13 (citation modified).

Notwithstanding the ALJ's substantially supported basis to dismiss all three medical opinions at issue, Mash purports to present distinct reasons to reconsider the ALJ's decision as to each. None have merit.

First, with respect to Dr. Morris, Mash attempts to argue that his treatment notes corroborate rather than contradict the assertions in his letter. Mash specifically contends that while Dr. Morris's treatment notes evince improvement in her mental health conditions, they never demonstrate a return to normal functioning (i.e., non-severe psychiatric condition). But to make this argument, Mash misreads the treatment notes themselves, which do not merely describe marginal progress; rather, they are replete with

discussion of Mash's extant stability and mental wellbeing. See, e.g., Doc. 4 at 501, 510, 1442. Her mental status examinations show the same. Id. at 501, 511, 515, 531, 1434, 1438, 1442.

Second, generously construed, Mash attacks the ALJ's dismissal of Dr. Prescott's opinion by arguing that the ALJ should have privileged it based on its ultimate endorsement by Dr. Morris, notwithstanding Dr. Morris's plethora of treatment notes indirectly doing the opposite. This argument falls with Mash's first. Given that the ALJ permissibly discredited Dr. Morris's divergent opinion letter for its inconsistency with his treatment notes, it follows that he was free to set aside Dr. Morris's endorsement of Dr. Prescott's opinion for the same reason.

Finally, with respect to Grover's assessment, Mash reaches for a one-word omission by the ALJ to suggest that the ALJ's decision is insufficiently reasoned. Specifically, Mash points to the ALJ's statement that "Grover's assessment is consistent with or supported by the medical evidence of record," Doc. 4 at 75, claiming that this facially favorable statement produces a "conflict," "never resolved in the text of the decision," with the ALJ's ultimate conclusion that Grover's opinion was unpersuasive. Doc. 5-1 at 4. Plainly, the ALJ's omission of the word "not" between "is" and "consistent" in this sentence amounts to a simple scrivener's error. The context—preceded by list of inconsistencies in Grover's findings and succeeded by the ALJ's

conclusion that her opinion is unpersuasive—make the ALJ's typo readily apparent. See Doc. 4 at 75; Hudon v. Astrue, 2011 DNH 143, 2011 WL 4382145, at *4 (D.N.H. Sept. 20, 2011) (collecting cases) ("In the context of social security cases, errors in ALJ decisions have been excused as mere scrivener's errors when the ALJ's intent was apparent."). And if a holistic reading of the ALJ's analysis fails to make his intent obvious, a close one surely does. The objects in the ALJ's sentence are written in the disjunctive—"consistent with or supported by"—making them a natural fit for a statement in the negative here, and an awkwardly avoidant one otherwise. Id. (emphasis added); cf. Pulsifer v. United States, 601 U.S. 124, 138 n.5 (2024) (noting that "context may drive" a single obvious meaning of a disjunctive statement). Moreover, the ALJ's neighboring analyses of Drs. Morris and Prescott's opinions use the exact same phrase, complete with the missing word, suggesting he meant to repeat the phrase with respect to Grover. See id. (writing, with respect to each, "This opinion is not consistent with or supported by the medical evidence of record." (emphasis added)). All that is to say, the ALJ's intent was obvious, excusing this minor error.

In sum, the ALJ's decisions to discredit Dr. Morris's inconsistent letter, Dr. Prescott's eight-year-old evaluation, and Grover's form assessment were supported by substantial evidence—namely, the extensive treatment records demonstrating Mash's successful mitigation of her mental impairments

through a prescribed treatment regimen and the state psychological consultants' corroboration of those records. Her arguments to the contrary are unconvincing.

## B. Vocational Analysis

Mash separately seems to contend that the ALJ's vocational analysis on step five was premised on erroneous testimony by the vocational expert. According to Mash, during the expert's testimony, the ALJ "failed to make any inquiry" regarding the impact of Mash's "need to sit or lie down when experiencing dizziness/vertigo from her POTS diagnosis." Doc. 5-1 at 4. With brevity bordering on waiver, see Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999), Mash seems to imply that this inquisitional shortcoming undercuts the reliability of the expert's opinion and thus demonstrates a lack of substantial evidence for the ALJ's vocational analysis, which wholly relied on that opinion. See Doc. 4 at 82-83.

Mash's theorized oversight by the vocational expert is unfounded. As the expert made clear at the outset of her testimony, her opinion was not solely informed by the ALJ's verbalized summary of Mash's impairments. Rather, the expert testified that she "reviewed the pertinent exhibits in [Mash]'s file and familiarized [her]self with them" prior to the hearing, id. at 115, and Mash does not contend that the assessments which noted her "need to sit or lie down" were omitted from that file, see Doc. 5-1 at 4. Moreover,

even if they were, the ALJ verbally alluded to Mash's need to periodically sit in his colloquy with the expert, albeit without identifying "dizziness/vertigo" as the symptom which would trigger that need. Id.; see Doc. 4 at 116 ("So, the individual must periodically alternate between sitting and standing."). Whichever the source, the expert was clearly informed of Mash's periodic need to sit before performing her vocational analysis. Thus, Mash presents no reason to doubt that the ALJ's decision adopting the expert's analysis was in turn supported by substantial evidence.

## IV. CONCLUSION

For the foregoing reasons, Mash's motion to reverse the decision of the Commissioner, Doc. 5, is denied, and the Commissioner's motion to affirm the decision, Doc. 6, is granted. The clerk shall enter judgment accordingly and close the case.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

September 1, 2026

cc: Counsel of Record